UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

KYLE JORDON WYATT,                          )
                                            )
                        Plaintiff,          )
                                            )
            v.                              )          No. 2:20-cv-00535-JMS-MJD
                                            )
JOHN PLASSE,                                )
LEE Lt.,                                    )
FUNK Captain,                               )
                                            )
                        Defendants.         )

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Kyle Wyatt, at all relevant times a pretrial detainee housed in the Vigo County Jail, filed
this civil rights suit alleging that he was subjected to unconstitutional conditions of confinement.
The defendants have filed a motion for summary judgment. Dkt. 42. For the reasons explained
below, the motion is **granted** as to all defendants in their individual capacities and **granted in
part and denied in part** as to Sheriff John Plasse in his official capacity.

**I.**
**Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a
case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no
genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a
matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A
"genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving
party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that
might affect the outcome of the suit. *Id.*

1

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

In this case, Mr. Wyatt failed to respond to the summary judgment motion. Accordingly, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); see S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II.
## Factual Background

At screening, the Court permitted Mr. Wyatt to proceed on claims related to his conditions of confinement including: (1) conditions that may have contributed to him catching COVID-19; (2) conditions related to time out of cell, access to showers, and mold; (3) an incident in which he found a tooth in his food; and (4) access to psychiatric medication. Dkt. 19. The Court breaks up the facts topically, although some areas overlap.

The Vigo County Jail is overcrowded. Dkt. 34-3 at ¶ 9. Mr. Wyatt was a detainee at the jail from January 2020 to July 2021. Dkt. 34-1 at 8, 15. He was a pretrial detainee until June 13, 2021, when he pleaded guilty to child molestation and was sentenced. *Id.* at 9. During his first five months of incarceration, he was housed in P pod in the jail. *Id.* at 16. He was then housed in L pod.

### A. Precautionary Measures for COVID-19

On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[1] The jail issued masks to inmates attending court hearings in June 2020. Dkt. 34-3 at ¶ 21. Jail staff began wearing masks in August 2020. *Id.* at ¶ 22. According to the jail's administrative sergeant, masks were given to inmates who were in quarantine, leaving general population, moving around the facility, and in common areas in November 2020. *Id.* at ¶ 24. After a COVID-19 outbreak in December 2020, all inmates were required to wear masks. *Id.* at ¶ 25. Mr. Wyatt tested positive for COVID-19 during this outbreak, and he testified he was not issued a mask and had not seen other inmates receive masks prior to the outbreak. Dkt. 34-1 at 18, 21. The outbreak was identified when the Indiana Department of Health Strike Force tested every inmate in the Vigo County Jail

---

[1] *See* Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," https://www.cdc.gov/museum/timeline/covid19.html (last visited Jan. 13, 2022).

after inmate Frederick Whitlock died of the virus.[2] *Cheesman v. Switzer, et al.*, case number 2:21-cv-00045-JMS-MJD (S.D. Ind.), Affidavit of Charles Funk, dkt. 72-4 at ¶ 16. Over 100 inmates tested positive during that testing. *Id.* at ¶ 17.

Inmates are provided with cleaning supplies each day, which include a mop, a mop bucket with a cleaning solution with disinfectant, dust mop, toilet brush, spray bottle, and rags. Dkt. 34-3 at ¶¶ 14−15. Trustees began disinfecting hard surfaces and holding cells in March 2020, and trustees and jail staff sprayed the shower with bleach on a weekly basis. *Id.* at ¶¶ 18, 20. More cleaning materials were provided after the December 2020 outbreak. *Id.* at ¶ 18.

Recreation was suspended after the outbreak. *Id.* at ¶ 26. Mr. Wyatt was quarantined for 15 days after he tested positive for COVID-19, which caused him to experience body aches, chills, fevers, and loss of taste. Dkt. 34-1 at 17−18. He received over-the-counter pain medication, which relieved his symptoms of body aches. *Id.* at 19.

Mr. Wyatt testified that he believed more should have been done at the jail to prevent the COVID-19 outbreak. *Id.* at 24. He said that inmates should have been issued masks, and the jail should have done more to prevent overcrowding in the cells. *Id.* at 21 ("[T]hey shouldn't have had us bunched up. . . [W]e was in a four-man cell and there was eight of us. Sometimes there was nine[.]"). He said that staff members were not wearing masks as they came and went. *Id.* at 24. He believed the inmates should have been provided more cleaning supplies, including bleach to disinfect the pods. *Id.*

---

[2] The Court takes judicial notice of the docket in *Cheesman v. Switzer, et al.*, case number 2:21-cv-00045-JMS-MJD (S.D. Ind.) and the affidavit of Charles Funk at docket 72-4.

### B. Conditions in P Pod

EZ boats, which are plastic liners within which a mattress is placed, are offered to inmates when there are not enough bunks available. Dkt. 34-3 at ¶ 11. For the first few weeks of Mr. Wyatt's incarceration, he slept on a mat on the floor because there were too many inmates to fit an EZ boat on the floor in the cell. Dkt. 34-1 at 40. For the next two months, Mr. Wyatt slept in an EZ Boat. *Id.* at 39.

Before the December COVID-19 outbreak, inmates were allowed out of their cells between 6:00 a.m. and 10:00 p.m., where they could play games, talk on the phones, shower, or have visitors. *Id.* at 33, 35. During quarantine, inmates were allowed out of their cell for one hour every three days, at which time they could shower. *Id.* at 33. Although inmates were supposed to receive an hour outside of their cell, they sometimes received only fifteen minutes. *Id.* ("Our hour out, when they did the once every three days, we only got 15 minutes out. We got 15 minutes apiece.").

Mr. Wyatt received cleaning supplies every day, and he and the other inmates cleaned their housing block. *Id.* at 33−34.

### C. Conditions in L Pod

Mr. Wyatt was transferred to L pod after finishing his quarantine. *Id.* at 20. Three or four inmates were assigned to two-person cells in this pod. *Id.* at 30. Mr. Wyatt occasionally slept on an EZ boat on the floor in L pod. Dkt. 34-1 at 41. Sometimes he used an EZ boat because there was no bottom bunk available for him, which he needed due to a prior injury. *Id.* at 42. While in L Pod, Mr. Wyatt was locked down in his cell for 23 hours a day. *Id.* He was able to shower on a daily basis in L pod, except for a few occasions due to staffing issues. *Id.* at 32.

Mr. Wyatt had access to cleaning supplies while in L pod, and he and the other inmates cleaned their cells daily. *Id.* at 36−37. There was black mold in the shower in the L pod. *Id.* at 45.

Neither he nor other inmates tried to remove the mold because they did not have protective equipment to do so. *Id.* at 46. Instead, Mr. Wyatt would stand in the middle of the shower, shower quickly, and leave to avoid the mold. *Id.* The mold was removed in February or March 2021 after jail staff had received grievances about it. *Id.* at 46–47.

### D.  The Tooth Incident

On October 6, 2020, Mr. Wyatt reported finding a tooth in his lunch. Dkt. 34-2 at ¶ 5; dkt. 34-1 at 25. An officer took the tooth to Jail Matron Casey Lee, who interviewed Mr. Wyatt about the tooth. Dkt. 34-2 at ¶¶ 6–7. Mr. Wyatt denied the tooth belonged to him or anyone else in his housing pod. *Id.* at ¶ 8. Matron Lee interviewed others from the housing pod and checked their teeth. Dkt. 34-1 at 27; dkt. 34-2 at ¶¶ 10–13. An inmate admitted that the tooth belonged to his former cellmate, who gave him the tooth after it fell out. Dkt. 34-2 at ¶¶ 14–18. Eventually, the tooth was given to inmate Shane Turner, who gave it to Mr. Wyatt. *Id.* at ¶¶ 19–20. Matron Lee's investigation determined that Mr. Wyatt intentionally placed the tooth in his food. *Id.* at ¶¶ 20–21.

Mr. Wyatt denied that he intentionally placed the tooth in his food, and said the other inmates were bribed with peanut butter sandwiches to lie about the tooth's origin. Dkt. 34-1 at 27–28.

### E.  Psychiatric Medication

Vigo County contracts with Quality Correctional Care ("QCC") to provide inmate medical care at the jail. Dkt. 34-3 at ¶¶ 28–29. Nurses and doctors at the jail are employed by QCC, and they handle prescribing and distributing prescription medication. *Id.* at ¶¶ 31–33.

When Mr. Wyatt first came to the jail, he had prescriptions for Wellbutrin and Buspirone to treat his depression and anxiety. Dkt. 34-1 at 48–49. Medical staff refused to provide him with

those particular medications and tried to give him alternative medications, but he suffered an allergic reaction. *Id.* At some point, a judge ordered that he be provided his original medications, which resolved the issue. *Id.* at 52.

### III.
### Discussion

Because Mr. Wyatt was at all relevant times a pretrial detainee, his conditions-of-confinement claim is analyzed under the Fourteenth Amendment's Due Process Clause. *Hardeman v. Curran*, 933 F.3d 816, 821−22 (7th Cir. 2019). To prove a conditions-of-confinement claim, the Court applies an objective standard. *Id.* at 823. That is, Mr. Wyatt must show "that the conditions in [the jail] posed an objectively serious threat to his health; that the officers' response was objectively unreasonable under the circumstances; and that they acted purposely, knowingly, or recklessly with respect to the consequences of their actions." *Mays v. Emanuele*, 853 F. App'x 25, 27 (7th Cir. 2021) (citing *Hardeman*, 933 F.3d at 823, 827 and *Miranda v. County of Lake*, 900 F.3d 335, 353−54 (7th Cir. 2018)). The officers' response is objectively unreasonable if it is "not rationally related to a legitimate nonpunitive governmental purpose" or is "excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (cleaned up).

#### A.  Medication

Mr. Wyatt alleges the defendants disregarded his need for his prescription psychiatric medicine. "Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted).  Here, none of the defendants had any personal involvement with prescribing or distributing psychiatric medication. Rather, it was the responsibility of medical staff employed by QCC. Accordingly, summary judgment is **granted** to the defendants with respect to this claim.

### B.  Tooth Incident

Mr. Wyatt alleges that Matron Lee and Jail Commander Funk failed to investigate the tooth incident and bribed other inmates to claim he was lying about it.

After Mr. Wyatt found the tooth in his food, Matron Lee investigated the incident, interviewing Mr. Wyatt and the other inmates in his pod and finding the owner of the missing tooth. She ultimately concluded that Mr. Wyatt had put the tooth in his food for personal gain. There is no evidence that Commander Funk had any involvement in responding to the incident.

These facts do not support a Fourteenth Amendment claim. First, there is no evidence that this one-time food contamination posed a serious risk to Mr. Wyatt's health or safety. Second, Matron Lee's response was objectively reasonable—that is, no jury could find that her investigation and conclusion evinced a reckless disregard toward Mr. Wyatt's health or safety. *Miranda*, 900 F.3d at 353−54. Accordingly, summary judgment is **granted** to the defendants as to the Fourteenth Amendment claim about this incident.

### C.  Conditions

Mr. Wyatt alleges that various conditions in the Vigo County Jail violated his constitutional rights. These conditions can be parsed into (1) conditions that increased his risk of contracting COVID-19 and (2) conditions that affected his quality of life and could have affected his health— i.e., limited time outside of his cell after the COVID-19 outbreak and the mold in the bathroom.

First, there is no evidence in the record that any of the named defendants were personally involved in monitoring the COVID-19 mask or cleaning policies, assigning Mr. Wyatt to his cells, providing him access to the shower, etc. Accordingly, summary judgment is **granted** as to claims against the defendants in their individual capacities.

Rather, Mr. Wyatt is asserting a claim against Sheriff Plasse in his official capacity as a

policymaker based on his failure to ensure the conditions in the jail met constitutional standards. "Indiana Code § 36-2-13-5(a) provides without further qualification that it is the sheriff's duty to take care of the jail and its prisoners. Thus, . . . the sheriff serves as the county's official decision-maker in matters involving the county jail." *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999).

In order to maintain a § 1983 claim against Sheriff Plasse in his official capacity, Mr. Wyatt must show that his constitutional rights were violated by a policy or custom of the Sheriff's Department. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694−95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

For *Monell* liability to attach, Mr. Wyatt must first show that he was deprived of a federal right, and then he must show that the deprivation was caused by a Sheriff's Department custom or policy or failure to implement a needed policy. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). *Monell* liability only attaches when the plaintiff shows that the municipality acted with deliberate indifference. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020). Further, to the extent that Mr. Wyatt is challenging a facially lawful policy (express or implied), he must provide evidence of a "pattern of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). If he is challenging an unconstitutional municipal practice or custom, he must show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up).

### i.    Conditions that Increased Risk of COVID-19

Under the deliberate indifference standard, Mr. Wyatt must show that he was at serious risk of exposure to harm because of the jail's COVID-19 practices, and that Sheriff Plasse "kn[ew] of a substantial risk of harm . . . and either act[ed] or fail[ed] to act in disregard of that risk."

*Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). The fact that Mr. Wyatt contracted COVID-19 is not enough to show deliberate indifference because the sheriff can avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

There is no dispute that the COVID-19 virus created a serious risk of harm to detainees' health, and that the general risk of exposure is exacerbated by the close quarters that detainees are subjected to. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that "the objective prong is easily satisfied" as to inmates' claims under Eighth Amendment challenging conditions of confinement in federal prison with dormitory housing at the start of the pandemic).

Thus, the Court must determine whether there is a dispute of fact as to whether the Sheriff's policies related to COVID-19—or lack thereof—evinced deliberate indifference. The Court concludes there is.

There is no evidence in the record that Sheriff Plasse had a written policy to combat the risk of inmates contracting COVID-19 in the overcrowded jail. In *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 382 (7th Cir. 2017), the Seventh Circuit concluded that a medical services provider could be liable for failing to establish a protocol for the coordinated care of chronic illnesses because the need for such a protocol was "obvious," so a jury could find that the lack of protocol caused the plaintiff's death. While the Court recognizes that the evolving nature of the COVID-19 virus and guidance provided by the CDC would warrant a flexible approach, a jury could find that the lack of a written policy resulted in a haphazard response in the jail.

To the extent that the Sheriff's Department had a policy to combat COVID-19 before the December 2020 outbreak that sickened Mr. Wyatt, a jury could conclude that the few steps taken were so ineffectual as to evince deliberate indifference. In an overcrowded facility, no efforts were

made to socially distance inmates.[3] Mr. Wyatt testified that cells were always over capacity and no effort was made to socially distance the inmates. Dkt. 34-1 at 21. Indeed, because of overcrowding, inmates had to sleep in EZ boats.[4] Sheriff Plasse does not explain why jail staff members were not required to wear masks until August 2020, or why inmates were not provided masks before December 2020. There was no evidence that staff members were screened for symptoms upon entry into the jail. Mr. Wyatt testified that mask rules for staff were not enforced. *Id.* A jury could find that the few policies enacted—increased cleaning, quarantining incoming inmates, and bleaching common areas—were insufficient in light of the serious risks posed by COVID-19 and other reasonable measures that could have been taken. *See Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020) (upholding grant of preliminary injunction where officials at immigration detention center failed to provide detainees masks or compel guards to wear masks, failed to enact social distancing measures, and failed to provide sufficient soap or hand sanitizer).

Many courts have granted summary judgment in favor of municipalities for their responses to the COVID-19 pandemic, but the jail officials in those cases enacted far more comprehensive policies than those presented here. *See e.g. Harb v. Penzone*, Case No. CV-21-01032-PHX-MTL, 2022 WL 17177675, *12 (D. Ariz. Nov. 23, 2022) (Maricopa County Sheriff not deliberately indifferent where in March 2020 jail enacted policies that restricted visitors, reduced inmate

---

[3] The Court recognizes that deference must be afforded to jail administrators in matters implicating safety and security concerns, including decisions related to inmate housing. *Mays v. Dart*, 974 F.3d 810, 820, 824 (7th Cir. 2020) (vacating portion of preliminary injunction that precluded Cook County Sheriff from double-celling inmates during COVID-19 because housing decisions implicated security concerns while upholding provisions regarding masks, sanitation, and testing). Here, though, the Sheriff provided no evidence related to social distancing efforts.

[4] Mr. Wyatt does not allege that he suffered an injury as a result of sleeping in an EZ boat. Rather, the Court considers this evidence in support of his claim that the jail was overcrowded to an extent that increased his risk of contracting COVID-19.

populations, distributed masks and cleaning supplies to inmates, required staff and inmates to wear masks, instituted screening protocols for everyone entering the jail, etc.); *Brogan v. BRRJA*, Case No. 7:21-cv-00180, 2022 WL 875040, *5 (W.D. Va. Mar. 23, 2022) (similar provisions including masks, temperature checks, and testing); *Carpenter v. Thurston County*, Case No. 3:21-cv-05859-BJR-JRC, 2022 WL 3239754, *5 (W.D. Wash. June 13, 2022) (similar provisions including screenings, quarantines, face mask directives, social distancing, and enhanced cleaning). In this case, however, there are material disputes of fact as to whether the Sheriff was deliberately indifferent to the serious risks of harm given the minimal safety measures he undertook.

Further, there is evidence that multiple inmates were injured by the Sheriff's policies. *Helbachs Café LLC*, 46 F.4th at 530. Mr. Whitlock tragically died, and over 100 inmates tested positive for COVID-19 shortly after his death.

For these reasons, summary judgment is **denied** as to Mr. Wyatt's *Monell* claim against Sheriff Plasse as it relates to conditions of confinement that created a risk of contracting COVID-19.

### ii.    Other Conditions

Mr. Wyatt alleges that he was subjected to unconstitutional conditions of confinement because, after the COVID-19 outbreak, recreation was suspended, and he was forced to remain in his cell for 23 hours a day. A pretrial detainee cannot be held in conditions that "amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Usually, Mr. Wyatt would have to show that the challenged condition was objectively unreasonable; that is, that it was "not rationally related to a legitimate governmental objective or that it [was] excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398. But to succeed on his *Monell* claim, Mr. Wyatt must show that being kept in the cell was an objectively serious condition that posed a risk to his health or safety, and

the Sheriff was deliberately indifferent to that risk. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). This he cannot do. The purpose of keeping inmates in their cells for 23 hours a day was to prevent the spread of a contagious disease. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) (observing that prison officials are required to provide "reasonably safe" conditions of confinement to prevent the exposure of inmates to communicable disease). Indeed, even under the objective standard rather than the deliberate indifference standard, Mr. Wyatt's challenge to this policy would fail because it was related to the legitimate governmental interest of preventing the spread of COVID-19 throughout the jail.

Mr. Wyatt's access-to-shower claim fails as a matter of law because he had regular access to showers. During quarantine, Mr. Wyatt was allowed to shower every three days. Otherwise, he was permitted to shower on a daily basis. He missed showers on occasion due to security or staffing issues. Dkt. 34-1 at 31. Limiting inmates to weekly showers does not state a deliberate indifference claim, *Jaros v. Ill. Dept. of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012), and Mr. Wyatt always had more access than that.

Mr. Wyatt's claim related to mold in the bathroom fails. Assuming that black mold is an objectively serious condition, the undisputed evidence shows that Sheriff Plasse was not deliberately indifferent to the risk of harm caused by exposure. First, inmates were provided cleaning supplies on a daily basis, including a scrub brush for the shower. Dkt. 34-3 at ¶¶ 14, 17, 20. The showers were cleaned with a bleach-based solution weekly. *Id.* at ¶ 20. Finally, once alerted to the mold issue, jail officials acted to remove the mold. Dkt. 34-1 at 46−47.

In summary, Mr. Wyatt's conditions of confinement claims that are unrelated to his exposure to COVID-19 fail because Mr. Wyatt has not shown that he suffered a constitutional

13

deprivation due to Sheriff Plasse's deliberate indifference. Summary judgment is **granted** as it relates to these claims.

## IV.
## Conclusion

The defendants' motion for summary [42] is **granted in part and denied in part**. It is **granted** as to all claims against the defendants in their individual capacities. The motion is **denied** with respect to Mr. Wyatt's *Monell* claim that Sheriff Plasse's policies or practices created conditions of confinement that increased his risk of exposure to COVID-19. It is **granted** as to all other conditions-of-confinement claims.

No partial final judgment shall issue. **The clerk is directed** to terminate Lt. Lee and Captain Funk as defendants on the docket.

The Court reconsiders Mr. Wyatt's request for counsel, dkt. [46], and will attempt to recruit counsel to represent Mr. Wyatt through final judgment. The magistrate judge is asked to hold a settlement conference once counsel has been recruited.

**SO ORDERED.**

Date: 2/3/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

14

DISTRIBUTION:

KYLE JORDON WYATT
267489
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

David P. Friedrich
WILKINSON GOELLER MODESITT WILKINSON AND DRUMMY
dpfriedrich@wilkinsonlaw.com

Magistrate Judge Mark Dinsmore